[No. A117221. First Dist., Div. Three. Feb. 15, 2008.]

PAUL WHITLOCK et al., Plaintiffs and Respondents, v.
FOSTER WHEELER, LLC, et al., Defendants and Appellants.

## COUNSEL

Brydon, Hugo & Parker, Edward R. Hugo, James C. Parker and John R. Brydon for Defendants and Appellants.

Levin, Simes, Kaiser & Gornick, William Andrew Levin, Laurel L. Simes, Sean P. Worsey; Law Offices of Daniel U. Smith, Daniel U. Smith and Ted W. Pelletier for Plaintiffs and Respondents.

## OPINION

**HORNER, J.**[*]—Plaintiffs and respondents Paul and Marguerite Whitlock (jointly the Whitlocks) sued defendant and appellant Foster Wheeler, LLC (Foster Wheeler), among others, asserting negligence, strict liability and loss of consortium for mesothelioma and other lung damage contracted by Paul Whitlock after his exposure to asbestos allegedly manufactured and distributed by Foster Wheeler. After a trial lasting 16 days, the jury deliberated for three days before returning a defense verdict in favor of Foster Wheeler. The Whitlocks moved for a new trial based on juror misconduct, which the trial court granted on that basis. Foster Wheeler appeals the trial court's order granting a new trial on grounds of juror misconduct. (Code Civ. Proc., § 904.1, subd. (a)(4) [authorizing appeal from an order granting a new trial].)

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

FACTUAL AND PROCEDURAL BACKGROUND

## A. *Pretrial and Trial Phases*

The Whitlocks filed their complaint on February 3, 2006, naming Foster Wheeler (as well as a host of other manufacturers and distributors of asbestos) as defendant in their suit for damages arising from Paul Whitlock's exposure to asbestos. In the complaint, Paul states he is dying from mesothelioma, a lung disease related to exposure to asbestos. Opening statements in the trial against Foster Wheeler and two other defendants were delivered on November 7, 2006.

The following facts were adduced at trial and on these the parties are not in dispute: The USS Kitty Hawk was commissioned in April 1961 as the world's first guided-missile attack aircraft carrier. Foster Wheeler constructed the boilers for the ship. Two of the components used in the construction of the boilers contained asbestos—the thermal block that was used as an insulating material and the high temperature gaskets used in the boiler pipes. In September 1964, a major overhaul of the Kitty Hawk began at Puget Sound Naval Shipyard at Bremerton, Washington. Paul Whitlock joined the United States Navy when he was 17 years old and after attending boot camp he reported for duty aboard the USS Kitty Hawk on January 6, 1965, when it was still undergoing the overhaul in Bremerton. He served as a boiler technician in Boiler Room No. 4 of the Kitty Hawk until discharged from the Navy in October 1967. In December 2005, Paul was diagnosed with mesothelioma, a fatal cancer of the lining of the lungs, which is almost always attributable to exposure to asbestos.

The key fact on which the parties disagreed, however, was whether Paul Whitlock was exposed to any of the original Foster Wheeler asbestos in the boilers during his tour of service on the Kitty Hawk. The Whitlocks' theory of the case against Foster Wheeler was that Paul Whitlock was exposed on three separate occasions to respirable asbestos fibers in the air during boiler repairs to the Kitty Hawk. These were (1) during the Kitty Hawk's overhaul at the Bremerton naval shipyard in 1965; (2) when the Kitty Hawk was docked at the Naval Air Station at North Island in San Diego between June and November 1966; and (3) after the Kitty Hawk returned from a tour of duty off Vietnam in 1967 and returned for repairs to the Long Beach Naval Shipyard in California. Foster Wheeler's theory of the case was that in the course of his duties aboard the Kitty Hawk Paul Whitlock may have moved asbestos insulation and "cleaned up asbestos-containing insulation and packing debris on a daily basis," but it was not insulation manufactured or supplied by Foster Wheeler in its boilers.

The Whitlocks rested their case on December 4, 2006, on day 15 of the jury trial. After moving some documents into evidence, Foster Wheeler, by then the sole remaining defendant, also rested without presentation of further evidence. Foster Wheeler then moved for nonsuit on several grounds, including that the evidence was insufficient to show that Paul Whitlock was exposed to an asbestos-containing product which Foster Wheeler supplied to the Kitty Hawk. On the basis of evidence showing that the boilers had to be cleaned and repaired after every 1,800 hours of use, Foster Wheeler asserted that the Whitlocks failed to show that the original insulation in the boilers was still in place when Paul Whitlock boarded the Kitty Hawk in 1965.

The trial court denied the motion for nonsuit, stating: "I think there's sufficient testimony and evidence for the case to go to the jury, and for me not to take it away from the jury on the issue of both the block insulation and the gaskets. The jury can decide whether to believe or not to believe the testimony. The evidence is that the block insulation was provided with the Foster Wheeler boilers. There is some evidence that there were variations of overhauls and repairs done to the ship. But I think it's up to the jury to determine whether or not those were to such an extent that there was no original block insulation in there. [¶] The same applies to the gaskets, although I think that's a much more difficult case for the plaintiffs. There was testimony that the gaskets were replaced when there was a need to open or adjust the areas, some, as I recall, every 1,600 hours. I think it's up to the jury to accept that or not to accept that, and not for the [c]ourt to take this away from the jury. [¶] Therefore, the defendant Foster Wheeler's motion for nonsuit is denied on those grounds . . . ."

The parties again took up this issue in their closing arguments to the jury. The Whitlocks' counsel stated he expected Foster Wheeler to argue that "all the asbestos insulation they sold was removed from their boilers before Mr. Whitlock joined the ship." Counsel asserted such a conclusion was contrary to the evidence. Specifically, counsel noted that Mr. Schroppe, Foster Wheeler's vice-president and chief engineer, testified there was no evidence in the repair file suggesting that the original insulation supplied with the boilers had been removed prior to 1965. Regarding exposure to block insulation in the boilers, counsel pointed to the testimony of Paul Whitlock's shipmate Mr. Elmquist, who served on the Kitty Hawk beginning in April 1962, and who testified that repairs to the boilers involving removal of brick and insulation was ongoing between September 1964 and May 1965. Counsel also reviewed Paul Whitlock's testimony, in which Paul described climbing in and out of the boiler during the repair work in order to haul buckets of debris from the boiler out of the ship. Counsel also referred to the videotaped testimony of another shipmate, Morley Clapp, who testified that the Kitty

Hawk's overhaul in San Diego in June of 1966 following its tour of duty to Vietnam involved tearing out and replacing at least 50 percent of the brick and insulation in all the boilers. Turning to asbestos exposure from gaskets, counsel reviewed evidence and testimony showing Foster Wheeler supplied asbestos gaskets to the Kitty Hawk; that the gaskets had to be changed every 600 hours; and that the ones being replaced had to be removed using wire brushes and scrapers, creating a considerable amount of asbestos dust.

On the other hand, Foster Wheeler argued that it did not cause Paul Whitlock's mesothelioma, and its counsel asserted plaintiffs had failed to prove it did so. Counsel noted that although Mr. Elmquist's testimony related to his time with the Kitty Hawk beginning in April 1962, the Whitlocks presented no evidence of what happened to the original insulation and gaskets in the ship's boilers between 1956 (when the keel was laid in the Kitty Hawk) and 1962. Further, counsel asserted that Elmquist had testified that when he arrived back on the Kitty Hawk in December 1964 (before Whitlock arrived in January 1965), he noticed the superheaters to the boilers were exposed. Elmquist stated that meant that whatever materials had been ripped out of the boilers in order to expose the superheaters had been ripped out while he was away at boiler school between September and December 1964. Counsel also attacked Whitlock's credibility, and the accuracy of his memory of events, based on differences between his deposition and his trial testimonies.

The trial court instructed the jury on the morning of Friday, December 8, 2006, and the jury retired to deliberations armed with a verdict form containing nine questions. The first question on the form stated: "1. Was Paul Whitlock exposed to asbestos-containing insulating block and/or asbestos-containing gaskets sold or distributed by Foster Wheeler? [¶] . . . [¶] If your answer to question 1 is yes, then answer question 2. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form and ring for the bailiff." On December 12, 2006, during the third day of deliberations, the jury answered "No" to the first question and thereby returned a verdict in favor of Foster Wheeler. Judgment on the special verdict was entered on December 27, 2006.

## B.  *Posttrial Phase*

On January 11, 2007, the Whitlocks filed a notice of intention to move for a new trial on grounds of juror misconduct. The Whitlocks provided declarations by three jurors in support of their motion for a new trial. Barbara R.,[1]

---

[1] In order to protect the jurors' privacy, we refer to their last names by initial only.

who sat as Juror No. 3 during the trial, stated she was one of the three jurors who voted yes on question No. 1. She indicated that all three days of deliberations were devoted to a discussion of question No. 1. At the end of the first day, jurors voted by show of hands on the question. Four jurors voted yes, four voted no, and four were undecided. At the end of the second day, four jurors voted yes and eight jurors voted no. She further stated: "During the deliberations, I heard [J]uror No. 2, Mr. [W.], express certain opinions to the other jurors based on his personal experiences in the Navy. [¶] During the deliberations, we continuously discussed whether the block insulation that was inside the Foster Wheeler boilers during the period that Mr. Whitlock served aboard the Kitty Hawk was the same block insulation that had been sold to the Navy by Foster Wheeler. . . . I raised the fact that Mr. Schroppe, the Foster Wheeler engineer, testified that insulating block in the interior of the boiler could be left undisturbed for as long as 25 years unless there was a specific reason to take it out. . . . Mr. [W.] stated to the other jurors that based on his own experience in the Navy, all of the original block insulation would have been replaced during previous repairs to the boilers before Mr. Whitlock came aboard the ship. Mr. [W.] stated that his experience in the Navy was that when the Navy performs repairs, it tears apart and replaces everything, even when the manufacturer's recommendations or guidelines don't call for replacement. By way of example, Mr. [W.] described to the other jurors his own experiences repairing circuit boards while in the Navy, and described how the Navy always took everything completely apart, and always replaced all components of the circuit boards, whether they needed to be replaced or not. [¶] . . . [T]here was also a discussion of plaintiffs' expert, Dr. William Longo, wherein Dr. Longo had explained how microscopic asbestos fibers from the Foster Wheeler block and gaskets could remain in the environment long after block and gaskets were removed. Mr. [W.] informed the other jurors that based upon his own experience in the Navy, asbestos fibers wouldn't still be there, as the Navy would always clean up thoroughly. [¶] At the conclusion of all these discussions, we took our final vote which resulted in a verdict in favor of defendant Foster Wheeler on question 1. Three jurors voted yes, and nine jurors voted no."

Michael M., who acted as jury foreman, made a similar statement attesting to how the voting progressed to a nine-to-three defense verdict after Juror No. 2, Mr. W., expressed personal opinions that, based on his naval experiences, the Navy would have removed all the block insulation before Paul Whitlock came on board, and all the asbestos fibers would have been cleaned up before Whitlock came on board because the Navy constantly and thoroughly cleaned up every day. Greg D., who sat as Juror No. 10, also stated that the voting progressed to a nine-to-three defense verdict after Mr. W. told

other jurors that, based on his experience working on Navy ships, "even if only part of a piece of equipment needed to be repaired it was standard practice to go ahead and replace everything. As an example, Mr. [W.] described work he had done repairing circuit boards aboard Naval ships. He described how all of the components of the circuit boards were replaced even when that wasn't really necessary. [¶] Thereafter, on the third day of deliberations, we took our final vote on question No. 1 of the verdict form which resulted in a verdict in favor of defendant Foster Wheeler. Three jurors, including myself, voted yes, and nine jurors voted no."

A hearing was held on the Whitlocks' motion for a new trial on March 7, 2007. On March 12, 2007, the trial court entered its order granting plaintiffs' motion for a new trial. In its order, the trial court set forth the grounds and reasons for granting the motion for a new trial as follows: "Plaintiffs' Motion for New Trial is based upon juror misconduct. In support of the motion, plaintiffs submitted declarations of three jurors. The three jurors describe statements made by [J]uror [W.] during deliberations. One juror declared that Mr. [W.] stated all of the original block insulation would have been replaced during previous repairs to the boilers before Mr. Whitlock came aboard the ship. Mr. [W.] stated that his experience in the Navy was that when the Navy performs repairs, it tears apart and replaces everything, even when the manufacturer's recommendations or guidelines don't call for replacement. Mr. [W.] went on to describe his own experiences repairing circuit boards while in the Navy, and described how the Navy always took everything completely apart, and always replaced all components of the circuit boards, whether they needed to be replaced or not. Two other juror declarations were consistent with this declaration. *No declarations disputing the statements were submitted.*

"These statements constitute juror misconduct. The issue of Mr. Whitlock's exposure to asbestos was hotly contested throughout the trial. The critical question for the jury was whether the original Foster Wheeler asbestos-containing block insulation inside the ship's boiler had been completely removed by the time Mr. Whitlock was aboard the ship. There was no testimony on the subject matter of Navy practices to take things apart and replace everything. Nor was there testimony what the Navy did when the manufacturer's recommendations or guidelines do not call for replacement. Thus, Mr. [W.]'s statements constituted external information in the form of a juror's own claim to expertise or specialized knowledge for which there was no evidence.

"In the [c]ourt's view there was significant conflicting evidence concerning exposure for the jury to evaluate. All three days of jury deliberation were devoted to a discussion of the first question regarding Mr. Whitlock's exposure. And, the votes taken during deliberations demonstrate that the jury had difficulty with this issue. The first vote was four for plaintiffs, four for defendant, and four undecided. The second vote was four for plaintiffs and eight for defendant. The final vote on December 12, 2006 resulted in three for plaintiffs and nine for defendant.

"The [c]ourt instructed the jury in accordance with the following instructions which are quoted in part: [¶] CACI 100 'Nothing that you see, hear, or learn outside th[is] courtroom is evidence unless I specifically tell you it is.' [¶] CACI 5002 'You must decide what the facts are in this case from the evidence you have seen or heard during [the] trial.' [¶] CACI 5009 'You should use your common sense, but *do not use or consider any special training or unique personal experience that any of you have in matters involved in this case. [Such] training or experience is not a part of the evidence received in this case.*'

"In evaluating a motion for new trial based upon juror misconduct, the [c]ourt evaluates whether juror misconduct occurred. If misconduct occurred, a presumption of prejudice arises which may be rebutted by proof that no prejudice actually resulted. [Citation.] Here, the court finds that Juror [W.]'s statements constituted misconduct creating a presumption of prejudice and further the presumption was not rebutted by defendant.

"Prejudice may be rebutted by showing that the prejudice does not exist. There was no such showing made. Prejudice may also be rebutted by consideration of whether there is a reasonable probability of harm by examining such factors as the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued. [Citation.] Here, the evidence that the statements were made has not been challenged by defendant. The misconduct was serious because it injected the unique personal experience of Mr. [W.] on a critical issue for which there was no evidence. His statements were not matters of common experience. That [the] jury's vote was close demonstrates a substantial likelihood that at least one juror was impermissibly influenced. [¶] IT IS HEREBY ORDERED that [p]laintiffs' Motion for New Trial is GRANTED." (Italics added.)

DISCUSSION

A. *Standard of Review*

Because the parties appear to be at odds on the issue, we shall clarify at the outset the standard of review applicable to Foster Wheeler's appeal of the

trial court's order granting the Whitlocks' motion for a new trial. The cases show that the appellate standard of review with respect to a motion for a new trial varies according to which of three procedural postures the case is in on appeal.

First, when a party appeals the *denial* of its motion for a new trial following entry of final judgment, the appellate court must independently review the trial court's determination of whether a defendant was prejudiced by juror misconduct. (*People v. Callahan* (2004) 124 Cal.App.4th 198, 209 [21 Cal.Rptr.3d 226]; see also *ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832 [30 Cal.Rptr.3d 588] ["When the court has denied a motion for a new trial, however, we must determine whether the court abused its discretion by examining the entire record and making an independent assessment of whether there were grounds for granting the motion."].) Patently, this standard of independent review does not apply here, because the trial court *granted* the motion for a new trial, and therefore there is as yet no final entry of judgment.

Second, a similar standard of independent review applies in cases where the trial court *grants* a motion for a new trial, but fails to give an adequate statement of its reasons for ordering a new trial in violation of Code of Civil Procedure, section 657 (section 657).[2] Our Supreme Court so held in *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624 [61 Cal.Rptr.3d 634, 161 P.3d 151] (*Oakland Raiders*). There, the court agreed with the Court of Appeal that "the absence of a statement of reasons [as required by section 657] calls for independent review of the trial court's order granting a motion for a new trial." (*Oakland Raiders*, at p. 640.) Under such independent review, the burden of persuasion is on the party seeking to *uphold* the trial court's defective order. As the court stated: "[O]rdinarily 'a party who seeks a court's action in his favor bears the burden of persuasion thereon' . . . [b]ut when a party such as the Raiders asks a reviewing court to sustain a *defective* trial court order, relying upon a ground stated in the new trial motion but not supported by a statement of reasons, the situation is reversed. Now 'the burden is on the movant to advance any grounds stated in the motion upon which the order should be affirmed, and a record and argument to support it' [citation] and to persuade the reviewing court that the trial court should have granted the motion for a new trial. Thus, the effect of the trial court's failure to file a statement of reasons in support of the order granting a new trial is to shift the burden of persuasion to the party seeking to uphold the trial court's order." (*Id.* at pp. 640–641.) Again, such is not the case here, where the trial

---

[2] In pertinent part, section 657 provides: "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated."

court stated its reasons for granting the new trial motion and therefore complied fully with section 657.

Rather, where the trial court supplies a statement of reasons as required by section 657, as the trial court did here, the applicable standard of review is abuse of discretion. Again, in the words of the Supreme Court: "When the trial court provides a statement of reasons as required by section 657, the appropriate standard of judicial review is one that defers to the trial court's resolution of conflicts in the evidence and inquires only whether the court's decision was an abuse of discretion." (*Oakland Raiders, supra*, 41 Cal.4th at p. 636; see also *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859 [107 Cal.Rptr.2d 841, 24 P.3d 493] ["[A]s a general matter, orders *granting* a new trial are examined for abuse of discretion." (Italics added.)].)

Further, as "[t]he standard for review of an order granting a new trial is abuse of discretion, . . . juror misconduct is an area in which the broad discretion is accorded to the trial judge. (8 Witkin, Cal. Procedure [(4th ed. 1997)] Attack on Judgment in Trial Court, § 139, p. 640.) Witkin distills the law on the point: '[t]he trial judge is familiar with the evidence, witnesses and proceedings, and is therefore in the best position to determine whether, in view of all the circumstances, justice demands a retrial. Where error or some other ground is established, his discretion in granting a new trial is seldom reversed. The presumptions on appeal are in favor of the order, and the appellate court does not independently redetermine the question whether an error was prejudicial, or some other ground was compelling. Review is limited to the inquiry whether there was any support for the trial judge's ruling, and the order will be reversed only on a strong affirmative showing of abuse of discretion.' (8 Witkin, *supra*, § 143, p. 644.)" (*Bell v. State of California* (1998) 63 Cal.App.4th 919, 930–931 [74 Cal.Rptr.2d 541].)

Courts have also stated the rule for reviewing the order granting a new trial as follows: " ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside. [Citations.]" [Citation.]' " (*Romero v. Riggs* (1994) 24 Cal.App.4th 117, 121 [29 Cal.Rptr.2d 219].) " ' "This court makes all presumptions in favor of the order as against the verdict, and . . . reverse only if manifest abuse of discretion is shown." ' [Citation.]" (*Maher v. Saad* (2000) 82 Cal.App.4th 1317, 1323 [99 Cal.Rptr.2d 213].) " '[T]he affidavits in behalf of the prevailing party are deemed not only to establish the facts directly stated therein, but

all facts reasonably inferred from those stated.' [Citation.]" (*Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 106 [95 Cal.Rptr. 516, 485 P.2d 1132].) And it is the trial court that must assess the credibility of affiants or declarants, and the trial court is entitled to believe one over the other. (*Id.* at p. 108; *Fredrics v. Paige* (1994) 29 Cal.App.4th 1642, 1648 [35 Cal.Rptr.2d 246].)

■ Moreover, our review for abuse of discretion extends to all aspects of the trial court's order granting a new trial, including the trial court's prejudice ruling. (*People v. Ault* (2004) 33 Cal.4th 1250, 1269–1272 & fns. 14 & 15 [17 Cal.Rptr.3d 302, 95 P.3d 523] (*Ault*) [holding that the appellate court reviews a trial court's grant of a new trial based on prejudicial juror misconduct for an abuse of discretion and rejecting the view that the issue of prejudice is a mixed question of law subject to independent appellate determination]; see also *Sierra View Local Health Care Dist. v. Sierra View Medical Plaza Associates* (2005) 126 Cal.App.4th 478, 484 [24 Cal.Rptr.3d 210] [holding whether the misconduct was prejudicial is subject to the trial court's broad discretion and citing to *Ault, supra*, 33 Cal.4th at p. 1272 regarding trial court's prejudice determination as subject to review for abuse of discretion]; *People v. Callahan, supra*, 124 Cal.App.4th at p. 209 [same, also citing *Ault, supra*, 33 Cal.4th at p. 1271].) In sum, where the trial court sets forth the grounds and reasons for granting a motion for a new trial in compliance with section 657, as the trial court did here, we review the trial court's order granting a new trial for abuse of discretion.

## B. *Analysis*

■ "In ruling on a request for a new trial based on jury misconduct, the trial court must undertake a three-step inquiry. [Citation.] First, it must determine whether the affidavits supporting the motion are admissible. (Evid. Code, § 1150.) If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.] Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial." (*People v. Dorsey* (1995) 34 Cal.App.4th 694, 703–704 [40 Cal.Rptr.2d 384].) And, as we concluded in our discussion above, "[a] trial court has broad discretion in ruling on each of these issues, and its rulings will not be disturbed absent a clear abuse of discretion." (*Id.* at p. 704.)

### 1. *Did Misconduct Occur?*

Foster Wheeler did not contest the admissibility of the affidavits below, nor does it do so now on appeal. Accordingly, we turn to the question of whether

Foster Wheeler has carried its burden of persuasion that the trial court abused its discretion in finding that Juror W.'s behavior amounted to misconduct. Foster Wheeler presents no evidence to counter the affidavits of Jurors Barbara R., Michael M. and Greg D., but rather asserts Juror W.'s remarks were permissible comments on the evidence and opinions based on his own life experiences in the Navy.

However, we cannot say that the trial court abused its discretion by finding misconduct in this case due to Juror W.'s comments. "Presentation to or reception by a jury of new evidence from sources outside the trial evidence constitutes misconduct." (*McDonald v. Southern Pacific Transportation Co.* (1999) 71 Cal.App.4th 256, 263 [83 Cal.Rptr.2d 734] (*McDonald*).) *McDonald* is instructive on the issue of misconduct. There, the plaintiff, a brakeman at a transfer yard, was struck by a train while sitting in his truck guarding a grade crossing and sued his employer alleging it was negligent for failing to place crossing gates at the location. (*Id.* at pp. 259–261.) The court found juror misconduct when a juror, who was a professional transportation consultant, interjected the subject of sensors, on which there had been no evidence at trial, and commented on the feasibility of installing crossing gates during jury deliberations. (*Id.* at pp. 262, 267.)

Like the juror in *McDonald*, Juror W. interjected matters outside the scope of the trial when he presented evidence to the jury about (1) the Navy's practice of wholesale replacement of parts, despite manufacturers' recommendations or guidelines to the contrary, whenever any repair was carried out; and (2) the Navy's practice of cleaning so thoroughly such that no asbestos could have been present after Whitlock came aboard the Kitty Hawk. Moreover, in this case the trial court specifically instructed the jurors *not to* inject their specialized knowledge into the deliberations, telling them that "[s]*uch training or experience is not a part of the evidence received in this case.*" Juror W.'s comments were in blatant violation of this jury instruction. In sum, although we acknowledge the "fine line . . . between using one's background in analyzing the evidence, which is appropriate, . . . and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which . . . [is] misconduct" (*People v. Steele* (2002) 27 Cal.4th 1230, 1266 [120 Cal.Rptr.2d 432, 47 P.3d 225]), we cannot say the trial court abused its discretion by finding Juror W.'s comments crossed that line and amounted to misconduct.

## 2. *Was the Misconduct Prejudicial?*

Foster Wheeler contends that even if Juror W.'s comments amounted to misconduct, they did not result in prejudice because even if they were outside the evidence at trial they were "consistent with the evidence at trial."[3] Foster Wheeler further contends Juror W.'s comments were not prejudicial because they may have been "just off-hand comments" and they lacked "context and specificity."

■ "A showing of misconduct creates a presumption of prejudice . . . ." (*McDonald, supra,* 71 Cal.App.4th at p. 265.) This presumption may be rebutted by " 'an affirmative evidentiary showing that prejudice does not exist' " based upon a consideration of such factors as " 'the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued.' [Citation.]" (*Ibid.*) However, as already noted, the Supreme Court has made clear that on review of an order granting a new trial, the standard of review with respect to prejudice is abuse of discretion. (*Ault, supra,* 33 Cal.4th at pp. 1271–1272.) Further, "[s]ince the trial judge had all the evidence before him on the merits of the case, and as well the . . . affidavits, he was in the best position to evaluate the prejudicial effect of the alleged misconduct." (*City of Pleasant Hill v. First Baptist Church* (1969) 1 Cal.App.3d 384, 430 [82 Cal.Rptr. 1].)

■ Turning to the factors noted above, it is undisputed that the events constituting the misconduct occurred. Three jurors provided affidavits attesting to Juror W.'s comments about the Navy's practices and procedures concerning repairs and cleanup, and Foster Wheeler did not offer opposing affidavits or otherwise place the credibility of the affiants at issue. As to the nature and seriousness of the misconduct, we note that Juror W.'s comments concerned two separate but related topics: the Navy's practice of wholesale replacement of components whenever a repair is carried out, even if not called for by manufacturer's recommendations or specifications, and the Navy's practice of scrupulous cleanup. Both comments bore directly on the hotly contested issue of whether Whitlock was exposed to Foster Wheeler's asbestos aboard the Kitty Hawk and tended to buttress Foster Wheeler's position that Whitlock was not exposed to its asbestos. Thus, Juror W.'s misconduct related

---

[3] Relying principally on *People v. Nesler* (1997) 16 Cal.4th 561 [66 Cal.Rptr.2d 454, 941 P.2d 87] (*Nesler*), Foster Wheeler contends that the trial court's prejudice determination is a mixed question of law and fact subject to our independent review. *Nesler,* however, involved a postjudgment appeal of a murder conviction challenging the propriety of the trial court's *denial* of the defendant's motion for a new trial "on the issues of both guilt and sanity, on the ground of juror misconduct." (*Id.* at p. 570.) As we explained above, the applicable standard is independent review in such a case, but where, as here, the trial court *grants* the new trial motion, the applicable standard of review is abuse of discretion. (*Ault, supra,* 33 Cal.4th at pp. 1269–1272 & fns. 14 & 15.)

directly to whether Foster Wheeler was at fault in causing Whitlock's mesothelioma. Finally, it can be fairly assumed that the opinions held by Juror W. certainly influenced his vote on the first and crucial jury question of whether Whitlock was exposed to Foster Wheeler's asbestos, and, according to the juror affidavits, the improper opinion evidence he presented to the jury potentially influenced the votes of as many as four other jurors, including the decisive ninth vote in favor of the verdict. This further supports the trial court's finding of prejudice. (See *Weathers v. Kaiser Foundation Hospitals, supra,* 5 Cal.3d at p. 110 ["Since the verdict was nine to three, the disqualification for bias of any one of the majority jurors could have resulted in a different verdict. Under the circumstances, the order granting the new trial is sufficiently supported by competent evidence."].) In sum, we cannot say that the trial court's prejudice finding was an abuse of discretion.

Finally, we note that Foster Wheeler presents two other arguments: (1) It bears no liability for any design defect because it built the boilers for the United States Navy in accordance with specifications and plans of the Navy; and (2) the Navy was a knowledgeable user of boilers and asbestos-containing products, a fact which negates any duty of Foster Wheeler to Navy employees such as Whitlock. These issues were not addressed in the trial court's order granting a new trial—the sole basis for appeal in this case. Nor does Foster Wheeler state in what manner or context these issues were presented to the trial court, or even how (or whether) the trial court ruled on them. Foster Wheeler does not cite to an order in the record reflecting the trial court's ruling on these issues, and does not explain how such an order would be appealable. In sum, absent an appealable order, appeal of these issues is premature, and under the "final judgment rule" must await entry of final judgment prior to appeal. (*Kinoshita v. Horio* (1986) 186 Cal.App.3d 959, 962–963 [231 Cal.Rptr. 241] [stating that the right to appeal is wholly statutory, no appeal lies from an interlocutory judgment, and that under the "fundamental principle known as the 'final judgment rule' . . . an appeal lies only from a final judgment"].)[4]

---

[4] By letter filed on February 11, 2008, respondents advised us of *Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42 [71 Cal.Rptr.3d 415]. In affirming the trial court's grant of a new trial on the basis of juror misconduct, the *Ovando* court stated that "[j]uror misconduct raises a rebuttable presumption that the misconduct was prejudicial . . ." (*id.* at p. 58), and reviewed the trial court's new trial order under an abuse of discretion standard (*id.* at pp. 58–59). The court also considered the "nine-to-three verdict" in concluding that the record as a whole "fail[ed] to rebut the presumption of prejudice." (*Id.* at p. 60.) Further, the court did not decide whether a new trial was warranted on grounds other than juror misconduct because "[o]ur affirmance of the new trial order means that there is no judgment in effect and that the appeal from the judgment is moot." (*Id.* at p. 60.) The *Ovando* court's approach on these points is entirely consistent with our own.

## DISPOSITION

The trial court's order granting the Whitlocks' motion for a new trial on the basis of juror misconduct is affirmed.

McGuiness, P. J., and Siggins, J., concurred.